UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Steven Begg,                                        Civil No. 04-4489 (PAM/RLE)

                 Plaintiff,

v.                                               **MEMORANDUM AND ORDER**

Hercules, Inc., a Delaware corporation,

                 Defendant.

---

This matter is before the Court on Defendant Hercules, Inc's Motion for Summary Judgment. For the reasons that follow, the Motion is denied.

**BACKGROUND**

This is a negligence action. Plaintiff Steven Begg worked at a paper mill owned by Boise Cascade Corporation ("Boise Cascade") in International Falls, Minnesota. Defendant Hercules, Inc. ("Hercules") is a chemical manufacturer that provides chemicals known as biocides to Boise Cascade for its paper manufacturing process. Biocides prevent microbiological activity that can damage the pulp and final paper product. The biocides used at the Boise Cascade mill are known as Spectrum 6800 and Spectrum 5080. Several Hercules employees are stationed at Boise Cascade's paper mill to sell the biocides and load them into tanks at the mill. The amount of biocides used must be calculated so that the chemicals prevent microbiological activity but are harmless to humans. For example, Spectrum 6800 is corrosive to the eyes and skin and causes skin sensitization.

Begg alleges that Hercules employees loaded unsafe amounts of biocides into a whitewater tank upstream from the area in which he worked.  On July 30, 2003, Begg's job was to clean the system associated with the "savealls," which are drums that recapture paper fibers from the whitewater systems.  Begg was not wearing protective clothing or gear because, typically, the amount of biocides added to the system were of a low, safe concentration.  While cleaning the equipment on July 30th, Begg alleges that he was soaked with water containing unsafe levels of biocides.  Begg was using a high pressure hose with water from the white and warm water tanks, and caked-on pulp from the saveall splashed on him.  In addition, the showers in the saveall were operating during the cleaning, and the saveall tanks were full of stock.

A few days later on August 1, 2003, Begg noticed a rash on his arm and leg.  The rash worsened a few weeks later after Begg ceased taking his arthritis steroid medication, which also functions to suppress allergic reactions.   Begg's body was almost covered with weeping sores.  During a later test for allergens, Begg tested positive for Spectrum 6800.  Begg also contends the chemicals exacerbated his arthritis condition because of the resultant pain and discomfort.

Begg alleges that Hercules knew or should have known that the biocides were toxic and would cause physical harm to Boise Cascade employees who came in contact with them.  Begg further alleges that Hercules employees were negligent in loading the biocides and in failing to notify or warn him.  Begg seeks damages for loss of income and earning capacity and for his medical expenses.

**DISCUSSION**

To prove negligence, a plaintiff must show: "(1) the existence of a duty of care; (2) a breach of that duty; (3) an injury was sustained; and (4) breach of the duty was the proximate cause of the injury." Lubbers v. Anderson, 539 N.W.2d 398, 401 (Minn. 1995). In its Motion for Summary Judgment, Hercules's primary argument is that Begg has not established that Hercules's breach of a duty was the proximate cause of Begg's injuries. Additionally, Hercules contends that Begg has failed to show that the alleged exposure worsened his arthritis. Finally, Hercules argues that it had no duty to warn Begg directly of the dangers of exposure to its biocides.

### A.   Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). As the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.      Proximate Cause**

Proximate causation is usually a question for the jury, but if "reasonable minds can arrive at only one conclusion, proximate cause is a question of law." Lubbers, 539 N.W.2d at 402. In this case, the evidence leads to more than one conclusion as there are several material factual issues.

Hercules has provided a flow diagram of the Boise Cascade paper mill. The flow of the mill begins at the broke chest and runs through the blend chest and machine chest to the stuff box, where additives and cleaners are added. Normally, biocides are added only to the broke chests and machine chests. The flow next runs through the paper machine itself. All of the stock then goes to the saveall before flowing to the whitewater storage tanks. However, the diagram provided also shows a line flowing from the blend chest directly to the saveall tanks after a "sweetener" is added. This flow line indicates to the Court that the stock traveling along this route to the saveall would have a high concentration of biocides, having come directly from the blend chest where the biocides are added. There is no information attached to the diagram explaining this flow line or the sweetening process. The Court finds that an issue of fact exists as to whether an unsafe concentration of biocides in the saveall tanks was created by stock flowing directly from the blend chest.

One of Begg's witnesses is Jeffrey Martens, a chemical engineer who worked with Begg at Boise Cascade in a supervisory capacity.[1] Martens also later worked for Hercules. Martens agrees that Hercules's normal operating procedure was to add the biocides into the broke chests and machine chests. However, Martens also claims that Hercules would dump pails of biocides directly into the whitewater tanks and warm water tank if there was any biological activity in the tank. If a large amount of biocide is added to a tank in this manner, there is an extremely high concentration in the tank. Martens's evidence creates an issue of fact whether Hercules was deviating from its normal operating procedure by dumping biocides into other tanks.

In April 2003, the mill's chlorine dioxide ("ClO2") system began having problems, and microbiological activity destroyed a large amount of paper product. To compensate for the decreased amount of ClO2, Hercules acknowledges that it increased the feed rate of Spectrum 5080 and 6800 to the machine chests and broke chests. Begg alleges that Hercules's

---

[1] Hercules urges the Court to exclude portions of Martens' First and Second Declarations. Hercules characterizes parts of the Declarations as expert reports, which were not timely disclosed under Federal Rule of Civil Procedure 26(a). First, the Court does not agree that the following portions of Martens's Declarations proffer expert opinions: Martens First Decl. ¶¶ 12, 19, 20, 24, and 26, and Martens Second Decl. ¶¶ 6, 7, 9, 10, 11, and 14. Rather, these paragraphs constitute lay opinions, which are admissible as long as they are based on personal knowledge or perceptions based on industry experience. Wactor v. Spartan Transp. Corp., 27 F.3d 347, 350 (8th Cir. 1994). Martens has vast personal knowledge and industry experience with respect to the biocides at issue, the Boise Cascade mill operations, and Hercules's products and procedures. Second, to the extent the remaining disputed paragraphs contain expert opinion, the Court has not relied on this information in addressing the Motion for Summary Judgment. Third, nothing in this Order prohibits Hercules from renewing its objections to Martens's Declarations at trial.

employee, John Bujold, unilaterally made this decision and did not tell anyone at Hercules or Boise Cascade. According to Begg, Bujold's logbook shows he intended to talk to Martens first, but did not. Martens denies that Bujold told him he was going to increase the levels of biocides. Further, Martens avers that Bujold later admitted that he failed to calculate a safe level of biocides for human contact. On the other hand, Hercules contends that the notations in Bujold's logbook show that he did consult with Martens beforehand. There is clearly an issue of fact material to whether Hercules increased the amounts of biocides without warning Boise Cascade.

On July 14, 2003, the ClO2 pump was removed for repair; thus, Begg alleges that there was absolutely no ClO2 flowing to the paper mill. This allegation is supported by testimony from Carrie Coffield, now a Boise Cascade Quality Assurance Manager. However, Hercules has submitted a spreadsheet showing that ClO2 was added to the whitewater system on July 30, 2003. Hercules does not explain how ClO2 could have been added when there was no pump to dispense it. Hercules does assert that Begg was exposed only to ClO2, not Spectrum 5080 or 6800, on July 30, 2003. Thus, there is a factual dispute as to whether Begg was exposed to ClO2 on July 30, 2003, and if so, whether that exposure caused his injuries.

There is also a factual dispute as to the amounts of biocides to which Begg was exposed beginning July 14, 2004. Hercules submits that Boise Cascade was not using more biocides during the summer months than it had in April 2003, when it increased the amount of Spectrum 6800 and 5080 to the broke chests and machine chests to compensate for the decrease in chlorine dioxide. Hercules also contends that the concentration of the increased amounts of

6

biocides was 25-50 parts per million ("ppm") and that it was diluted as it ran through the system. According to Begg, however, the 25-50 ppm is a target level, and thus more biocides are added to compensate for the eventual non-reactivity caused by interaction with microbiological activity. Further, the water used for dilution also contains biocides, which further increase the concentration.

The next issue of fact also pertains to the amount of biocides to which Begg was exposed. According to Hercules, the systems are shut down on cleaning days, and no water flows from the whitewater system. Paper Machine No. 3, where Begg was working on July 30, 2003, was shut down for repairs that day. Thus, according to Hercules, the machine was nonoperational, and no stock was cycling through the process. Even if the broke chest had been dosed on July 30, none of the biocides would have reached the saveall because the stock chest valves and pumps were shut off. Begg disputes Hercules's position. According to Begg, the equipment is not locked on repair days until after the nozzles are unplugged and all the tanks are cleaned. Begg's exhibits show that the saveall was emptied and the showers turned off at about 6:30 a.m. on July 30, 2003. By the start of Begg's shift at 5:30 p.m., however, the saveall was at normal capacity and the showers were on. Moreover, Begg notes that even when he was not cleaning a tank, he was exposed to mist from the saveall and other tanks which regularly soaked him with biocide-laden liquid. There is clearly an issue of fact regarding the amount of biocides to which Begg was exposed.

In conclusion, the Court finds there are numerous material issues of fact that preclude summary judgment on the issue of proximate causation.

**C.     Duty to Warn**

Hercules asserts that it had no duty to warn Begg directly about possible side effects of exposure to its biocides.  Hercules contends that it satisfied its duty to warn by providing Boise Cascade with safety information about the biocides.  According to Hercules, the safety information was published on Boise Cascade's database, which employees can access at any time.  In addition, the product labels on the biocides contain information about health hazards.  Hercules contends that its actions entitle it to both the sophisticated intermediary defense and the bulk supplier defense.

The sophisticated intermediary defense applies when "it is highly impractical for the supplier to provide a warning directly to the end user."  Gray v. Badger Mining Corp., 676 N.W.2d 268, 277 (Minn. 2004).  Hercules submits that it appropriately relied on Boise Cascade to provide its employees with safety information.  The bulk supplier defense is similar to the sophisticated intermediary defense.  A supplier of bulk material "can discharge its duty to warn the end user by warning the buyer of the dangerous condition of the materials."  Id. at 280.  Hercules avers that this defense applies here because it could not directly warn every Boise Cascade employee of potential risks associated with the biocides.

The sophisticated intermediary defense and the bulk supplier defense do not entitle Hercules to summary judgment.  Begg does not contest the applicability of the defenses insofar as they relate to Hercules's normal loading of the biocides.  Begg's assertion is that Hercules had an additional duty to warn Boise Cascade or its employees when Bujold allegedly increased the amount of biocides to an unsafe level.  Hercules has not addressed this particular

argument. Viewing the facts in the light most favorable to Begg, and assuming that Bujold did increase the amounts of biocides to an unsafe level, summary judgment must be denied on the duty-to-warn issue. There is also a disputed issue of fact about whether Hercules did notify Boise Cascade of any increase in biocide levels. Bujold claims that he did, but Martens is adamant that Bujold did not.

**D.     Exacerbation of Begg's Arthritis.**

Hercules avers that the opinion of Begg's doctor, Dr. Ramquist, does not establish that Begg's exposure to biocides at the Boise Cascade mill caused an exacerbation of his arthritis. When Begg first saw Dr. Ramquist after the alleged exposure, the doctor's treatment notes do not mention a flare-up in Begg's arthritis. However, in October 2004, more than a year later, Dr. Ramquist concluded that the exposure to Hercules's biocides worsened Begg's arthritis. Hercules argues that Dr. Ramquist based his opinion only on the temporal proximity between the exposure and the exacerbation of Begg's arthritis, which is insufficient to establish causation as a matter of law.

Hercules mischaracterizes Dr. Ramquist's opinion. Dr. Ramquist concluded that exposure to Spectrum 6800 stimulated Begg's immune system by causing an allergic reaction. In turn, this caused his autoimmune disease, rheumatoid arthritis, to flare severely. Thus, Dr. Ramquist's opinion does not rest on mere temporal proximity, and Hercules's case, <u>Willert v. Ortho Pharmaceutical Co.</u>, 995 F. Supp. 979 (D. Minn. 1998), is inapplicable.

Viewing the evidence in the light most favorable to Begg, the Court finds that Dr. Ramquist's opinion is not based solely on temporal proximity. Dr. Ramquist tied the exposure

to the biocides directly to Begg's allergic reaction, as further evidenced by the patch test. The allergic reaction affected Begg's autoimmune system, exacerbating his rheumatoid arthritis. Moreover, the sufficiency of Dr. Ramquist's opinion is a question for the jury, particularly with respect to the extent of Begg's injuries and any history of noncompliance with medical treatment. Accordingly, summary judgment is not appropriate on this issue.

**CONCLUSION**

Genuine issues of material fact exist with respect to the issues of proximate cause, the duty to warn, and the extent of Begg's injuries. Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Hercules's Motion for Summary Judgment (Clerk Doc. No. 21) is **DENIED**.

Dated: October 22, 2005

s/ Paul A. Magnuson
Paul A. Magnuson
United States District Court Judge